Carol Swan Good morning, Your Honors. May it please the Court, I'm Darla Mondew representing Ms. Swan on appeal. I'd like to reserve three minutes for rebuttal, if I may. Yes. Thank you. Ms. Swan brings the issues before this Court that involve a two-hour block of time that occurred on February 3, 2011, which involved the unconstitutional conduct of the law enforcement officers in Augusta, Maine. And that two-hour block of time has caused the impact even as we stand here today. I know I've written extensively about the custody issue, but I just want to condense it down before I go to the harmless error issue. Ms. Swan was seized under case law when she complied with Detective Verdon's show of authority when he demanded his money. The Supreme Court said in California v. Hodari D. that submission to a show of authority is seizure as long as it's accompanied by coercion. And there can be no doubt that a demand to give him his money twice was coercive. In fact, the district court agreed that she had no choice but to give him the money. Therefore, at that moment, she was seized under Hodari and Mendenhall. Contributing to the seizure was the fact that she was blocked, her vehicle was blocked in the parking lot with no means of egress whatsoever, which the district court agreed she more likely than not could not leave. The government would have you believe that she could have walked away, hidden in a bush, hidden behind a snow bank, whatever, but that's not what happened. And she wasn't required to leave her vehicle and hide from the officers to be free from being seized. A reasonable person in her situation with a demand for my money two times, law enforcement officers, holstered guns, blocked vehicle, gave in to that show of authority. Therefore, from that moment, she was seized. What transpired next, I could find no case whatsoever, anywhere, that found a person was not in custody when they were transported, when they were transporting the very law enforcement officer who was going to interview, interrogate, or conversation, as they called it, to police headquarters. Either it has never happened, it's never been appealed, I have no idea, but it's a fact that Bucknum, in her car, with his gun, with her cell phone gone now, because they took it before he got in the car. And the county sheriff's magistrate judge agreed that she was going to Kennebec County Sheriff's headquarters and nowhere else. She was guarded. She was in custody. The custody never ended. As a matter of fact, this court in United States v. Quinn discussed that blocking a vehicle was intimidating. Didn't come out right and say what the two cases I cited from the 7th and 6th circuits said, that you block a vehicle, that's custody. But I submit to you that the combination of the demand for the money, the coercion to give them the money, the blocking the vehicle, the taking the cell phone, she was in custody. He kept her in custody in the vehicle. She went there, nowhere else. She had no way to call for help. She had no way to go to Walmart and say, give me a cell phone. I need to call somebody. She was going to Kennebec County Sheriff's Office. And once we get there, we have Detective Rudin soft pedaling that we just want to have a conversation with you. No big deal. There's the door. You can leave anytime you want. Okay. She says, I'll sit down. She sits down. They do the biographical information. She goes, can I have my cell phone? And I got to back up one minute. In the parking lot, she pulled her cell phone out of her back pocket. Of course, there's two different versions in the transcript of how the cell phone works. It became in the possession of Buckman. But even if we go with what the magistrate judge found, that Buckman said, can I have my phone? Can I have your phone? And she gave it to him. When they got to the sheriff's headquarters, and it was just a conversation, and she asked for her phone back. Well, I'm not going to keep it, but not yet. So their government has cited no case that says law enforcement can take and keep a cell phone from somebody they just want to talk to. Matter of fact, the district court likened it to being a guest in someone's house. And I've never been a guest in anyone's house where I had to give them my cell phone. I may have turned on the ringer. I may have to even, I suppose, power it down or vibrate only. But house guests don't give up their cell phones. They may make them quiet. So that analogy has no force, it should have no force before this court, that they had a right to keep the cell phone from a person they wanted to have a conversation with. That brings us to the needing Miranda rights before they interrogated her. Not interviewed, interrogated, because the questions were definitive. Tell us what you did. Tell us how you did it. When's the first time you did it? How much money did you get from him? Blah, blah, blah. And this is on top of knowing full well what she did that morning with Frank Monroe. You've reserved some time. I'm Margaret McGoy for the United States. The court is fully familiar with the standard of review that applies to confessions. If I may emphasize one point of that standard of review, it is that credibility determinations are uniquely for the finder of fact to resolve and will not be set aside on direct appeal. There are five credibility determinations in this case that I would like to emphasize. One is the district court found as a fact that the police did not trap the defendant in the car, that she was already out of the car by the time they pulled into the parking lot. Second, the court found as a fact that Reardon did not instruct the defendant to go to the police station, that she voluntarily agreed to go there, and that makes sense because it was cold, it was snowy, and it was going to be much more comfortable to continue the conversation in the police office, which is what was suggested and what the defendant readily agreed to do. That's a finding of fact. The court found that Reardon did not require Bucknum to accompany the defendant, that she readily agreed that he could ride in her car. When the defendant testified in many ways that were contradictory to the police, the magistrate judge found as a fact that the police officers were the more credible witnesses. With respect to the defendant's testimony, the court said that about most events, the defendant's testimony on which her theory relies was, quote, highly strategic in nature and less than reliable. And to sum it up, the magistrate judge said that the factual premises for the defendant's legal arguments were in conflict with the magistrate judge's findings of fact. Now, this court can be very confident on those credibility choices for several reasons. One is that the same testimony concerning the same confession was presented to two juries, both of which decided to convict this defendant. That's 24 people who did not believe the defendant's account. But this court needn't affirm simply because the magistrate judge in effect found everything that Carol Swan testified was incredible. The objective facts, many of which were not in dispute, suggest that this defendant was never in custody, not from the beginning to the very end when she was told to go home and she in fact did go home. With respect to the place where the encounter began, it was broad daylight in the public parking lot of a public either laundry or dry cleaner, we're not sure. The police did not corner the defendant. She was already out of her car and moving into the dry cleaner at the time. There were two police officers. They were in plain clothes. They called out her name. They politely introduced themselves. There were no harsh language of any sort. Restraint. There was absolutely none. The police didn't even touch her. Duration. That encounter lasted only a few minutes. Now the defendant's theory as to why she was in custody in the parking lot hinges in part on her theory that once she exceeded to the request to turn over the bag that contained the sting money that she was in custody. She was exceeding to a show of force. Well, that defies common sense. She could have turned over the bag and walked away and required the police to arrest her, but she didn't. She turned it over and walked away. She continued to engage them. With respect to the cell phone, the district court found as a fact the police did not grab it. And the defendant's theory that anyone who is required to give up their cell phone... What is the finding as to how the cell phone came into the police's possession? The district court was rather vague about it was in her hand at one point. There's no finding that she gave it to them voluntarily. The more important issue is whether a person who is deprived of their cell phone automatically becomes in custody by virtue of that. There are people in this very courtroom who are required to surrender their cell phones downstairs and they're not in custody. So that fact simply does not cut for the defendant. The defendant's insistence that she was told to go to the police station. The district court rejected that and said that she readily agreed to go to the police station. The defendant's insistence that Reardon insisted that Bucknum... Can I just ask you about that? You could be told to go somewhere and you could readily agree. Both could be true. So did the district court reject the idea that she was told to go there? No. The district court rejected the notion that she was compelled to go there. Did it actually make a finding that she was not compelled? She was not compelled. That she readily agreed to go. That there was no compulsion. The overall finding of the district court was that the defendant was not compelled to do anything. But she was specifically not compelled to go to the police station. But if I may get to what happened at the police station because that really is the be-all end-all. I am reading from the first page of the transcript of the interview several quotations. The police. You are not under arrest. The defendant. Okay. The police. At any point you want to get up and walk out of here, that's fine. You just came in through the exit and all you got to do is open it up and go out. Defendant. Okay. The door is being closed only for privacy purposes. Okay. The police. If you don't want to have that conversation, that's fine. The defendant. Yeah. The police. Again, you're not under arrest. All you got to do is open the door and walk out. Defendant. Okay. Later on in the discussion when it appears the defendant is hedging, the police say, if you're lying, just get up and go. And she doesn't. Toward the end of the conversation, the defendant was allowed to call her husband on her cell phone. The police in fact left the room and she invited them back at the end of the conversation. She was heard saying to her husband, they tell me I'm not under arrest. So she clearly understood she had been told she was not under arrest. But then tellingly, at the end of the interview, the police said, go home. And that's exactly what she did. So she was never in custody in any of these circumstances. Excuse me. You know, it seems like all these custody cases depend on the facts, particular facts. And almost never is one single fact enough one way or the other. So I think what I look at is the whole gamut of things that happen. And of course, we know that the findings of fact are almost in cement in the sense that they are very difficult to challenge with success, I should say. Here are some of the facts that I think regardless what the magistrate decided that speak for themselves. Again, not singly, but in the whole sequence of events. First of all, the police put their car in a blocking situation. Second, whether she gave it to them or they asked for it or what, they ended up with the custody of the cell phone. Third, they sent a police officer aboard her car to go to the police station. Now, the question I ask myself, are those three facts correct? Those three facts, which I think are even accepted by the magistrate, the significance of them is what we're discussing right now. But those three facts do take place. Those three facts do take place. There are alternative interpretations of those, which are the ones that the government has offered and the magistrate judge accepted. But in the totality of the circumstances, those cannot outweigh the repeated advice by the police that the defendant was not in custody, she did not have to talk, she was free to go, and she in fact did go. So you're right, Judge Toraway. Before we get to that, I don't think that the record shows that she was told she was free to go until they got to the police station. Correct, and the only thing she said... Excuse me, does that mean that she was in custody up to the point that they got to the police station? She was not in custody up to the point where she was at the police station, but certainly after she got to the police station, she was not in custody. And assuming she was in custody at the parking lot, the only statements she made were, that's money Frank owed me and am I in trouble? In terms of the substance of the confession that was admitted at trial, in truncated form, all of that was made after the defendant had been repeatedly told she was free to go, she was not in custody, she did not have to talk. Well, but the turning over of the money seems to be a fairly incriminating evidence, and that took place before Miranda warnings had been given, and if she was in custody... The seizure of the money is not a Fifth Amendment statement. The seizure of the money is a Fourth Amendment issue which this defendant has not raised at all. If I may, I have 10 seconds left to address the harmless error argument. Before you do, could you just assume there was custody before they get to the station house for the interview, and assume that the colleague you just gave us about what occurs there, if it hadn't been preceded by custody, would show that she clearly was not in custody. Is there any case law that tells us what we are supposed to look at to decide whether custody has been broken? I looked for that issue, Judge Barrett, and I didn't really find anything that was persuasive one way or the other, but certainly once a defendant is told that they're free to go and acknowledges that they're free to go, one would think that whatever custodial situation might initially have existed was dissipated and broken. But my time is up. I don't want to abandon the harmless error argument. Why don't you take a minute and highlight it? I would love to do that. Thank you. With respect to the tax cases, before the jury heard anything about those charges, there were 79 witnesses, two tellers, and a tax preparer, all of whom testified that the defendant owed $145,000 in taxes for the operative years, and paid only $189,000 of what she was owed. That was before the confession was even alluded to. When the confession was admitted, it was in very much redacted form. Only 19 pages of the 90 pages of the interview came in before the jury. The police officer was fully cross-examined about the voluntariness of that, the circumstances under which it was given. With respect to the benefits charges, there were a host of witnesses who testified that the defendant was living a perfectly normal, active, working life at the time she was applying for and receiving benefits, that she was overpaid by $107,000, and that was without any reference to the confession. She testified that she completely disavowed her confession. Everything was lied. She was a beaten woman. All of this was a setup, and she was conducting a private investigation to frame Mr. Monroe. With respect to the extortion case, Monroe testified about the $3,000, $7,000, and $10,000 extortions that were charged in counts 1 through 3 that was corroborated by 10 recorded telephone calls, photographs, Bucknum, who again was cross-examined about the nature of the confession. In that trial as well, only a redacted portion of the transcript came in. In both trials, the full confession and full transcript came in in the defense case, not in the government's case. In both cases, the judge told the jury that it was for them to decide what rate to assign to the confession. In the government's view, assuming there is error, and in the government's view, there is none, any error was clearly harmless beyond a reasonable doubt. If you'll indulge me for another minute, I just had a couple of questions about the cell phone. I'm interested in how you read the record. When the police say they asked for the cell phone so that she would not be distracted, do you take that as they sincerely were concerned that she would be distracted, or that that was something they said to her in aid of unhorsing her from her phone? I think it is a legitimate law enforcement objective. Sounds make-believe to me. Well, I'm distracted when my cell phone rings. I don't know about anybody else, but I think it is a factor of human nature that the police could believe that the defendant would be much more likely to focus on the matter at hand if her cell phone didn't keep ringing. But this is during the brief conversation in the parking lot about the money? The time when they make clear that they're going to keep it for a while is after... No, I mean when they asked for it. I'm having trouble understanding, getting the connection between we're really worried that you're going to be distracted here in the parking lot, so could we just take your cell phone? I would think that if the phone were ringing in the police officer's hand, that would be more distracting to her. I'm just confused about it. The comment about it's distracting for you was made, my interpretation of the record, is after they were at the police station. When the police obtained possession of her cell phone in the parking lot, I think there's a legitimate law enforcement objective of taking it from her, even if they did. But the magistrate was a little unclear about whether they took it or asked for it. I thought that the magistrate suggested at that point that it had been asked for so that she wouldn't be distracted, but I stand to be corrected. Well, certainly the comment about being distracted was made, my interpretation of the record, is in that transcript, and you can look for it there. And I don't believe that comment appears with respect to the testimony in the parking lot. The testimony in the parking lot is simply that the defendant had it in her hand and that the police got it. Okay, so one more question. So do you know, this is outside the record, this is just my own personal edification, is that now standard police practice in sort of consensual, voluntary interviews to unhorse people from their cell phones? I can't answer your question authoritatively, but my guess is you're right. And my guess is that particularly in drug cases, for example, the police would want to take a cell phone from an individual from contacting confederates. And that logic applies here as well. Because if the defendant, I'm theorizing. I'm not going to hold you to it. If the defendant had gotten ahold of her cell phone and said, Frank Monroe, you retract everything you say right now or I'm coming to get you, there might be repercussions for the case of guilt. So there are legitimate law enforcement purposes for depriving a person of their cell phone anyway, but it does not by itself or even in consideration of the other factors here provide a custody situation. Thank you. Yes, I ask your honors for a little bit of latitude on my argument on timing as well. First off, I'll bet you everybody in here, not a lawyer, had to leave their cell phone with the marshals. Voluntarily they did it to get in. And I'll bet you when they go back and they ask for it after they've done what they want to do or told they're free to leave by this court, they're going to get it back. She asked for her phone. What would have happened if they gave it back to her? We know not. Would she have said, okay, I'm going to call a lawyer? Okay, I'm going to call my husband? Okay, I'm out of here, guys. We don't know because he said, no, you can't have it yet. Just a minute. I'm not going to keep it. Is that precisely what he said, you can't have it yet? He said, she said, can I have my cell phone? He said, yes, I'm not going to keep it, but I don't want you to be distracted. And he kept it to his far left. And she says what in response? Probably okay. Because she testified at the trials years later when asked by defense counsel, why didn't you tell the cops about this thing that you had going? And she said, I wanted to tell them anything I could just to get out of there. That was elicited at trial years later. Excuse me. My notes tell me that the cell phone was taken as they departed the parking lot. That's correct, your honor. The way I read the transcript and the judge's decision was that they saw her pull her cell phone out of her jeans pocket and she started to make a phone call. And I think she turned and said, am I in trouble? And aborted call to make that statement, whether she was looking down or had the number in, I'm not sure. But then Buttonham said, can I see your phone? Can I have your phone? And she gave it to him. Now, eventually the phone got in the hands of Reardon because Buttonham did not have her phone in her car when he guarded her on the way to Connecticut County. So the phone wasn't even anywhere in the vicinity where she could say, can I have my phone in the car? Because Reardon, the DVD shows Reardon bringing it in. So I submit to you that, no, the custody was not broken. I found no case where I found no facts to say the custody was broken. I don't think the fact can be interpreted in the way the government wants. And as far as the introduction of the confessions, whether they be the redacted versions or the big versions, whatever, yes, there was no Fourth Amendment issue on the seizure of the money, and that's not for this particular form. That's 2255. There was a lot of things that weren't done that I can't raise in front of your honors because it requires hearing. You said that before in the prior case. However, let's talk about what the confession did to the tax trial. I know what it did to the extortion trial. But the tax and workers' comp fraud trial, did it matter how she came into possession of the unreported income from Monroe? Maybe she babysat for his kids. Maybe she cleaned his house.  Did it have to come in for an IRS case that it was extortion? Is there a separate category on a Schedule C that says, oh, this is extortion? That reason or the means of how she got the money had nothing to do with the fact that, yes, Monroe would have had to testify that he paid her. He did not have to testify. It was not central to the government's case material on how she got it except for one reason. It showed she cheated on her taxes. She cheated on workers' comp. She paid for her brother's horses. Oh, by the way, she also extorted money, so she's guilty. If that introduction of the confession at the tax trial was unnecessary, prejudicial, they would have gotten the conviction on the tax fraud without the extortion, and that, Your Honor, is the prejudice from the admission of the confession. Thank you. Thank you.